[Cite as *State v. Davis*, 2011-Ohio-292.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                    )
                                  )
    PLAINTIFF-APPELLEE,           )
                                  )
VS.                               )        CASE NO. 08 MA 236
                                  )
MICHAEL A. DAVIS,                 )        OPINION
                                  )
    DEFENDANT-APPELLANT.          )

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 08CR128 |
| JUDGMENT: | Affirmed |
| APPEARANCES: For Plaintiff-Appellee | Paul Gains Prosecutor Ralph M. Rivera Assistant Prosecutor 21 W. Boardman St., 6th Floor Youngstown, Ohio 44503-1426 |
| For Defendant-Appellant | Attorney John P. Laczko 3685 Stutz Drive, Suite 100 Canfield, Ohio 44406 |

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: January 24, 2011

DONOFRIO, J.

{¶1} Defendant-appellant, Michael Davis, appeals from a Mahoning County Common Pleas Court judgment convicting him of six counts of aggravated murder and 19 counts of aggravated arson, following a jury trial, and the resulting sentence.

{¶2} In the early morning hours of January 23, 2008, Retia Crawford was awakened by Christopher Taylor after her family's two-story house at 1645 Stewart Avenue in Youngstown had caught on fire. Retia ran upstairs from her basement bedroom to try to wake the others who were asleep on the second floor. She became overwhelmed by smoke and escaped outside as did Taylor, Julius Crawford, Ricky Williams, and Domika Wilson.

{¶3} Six people died in the fire from carbon monoxide intoxication through smoke inhalation. The victims were Carol Crawford, her daughter Jennifer Crawford, and Jennifer's four children, eight-year-old Ranaisha Crawford, five-year-old Jeannine Crawford, three-year-old Alisha Crawford, and two-year-old Brandon Owens.

{¶4} Appellant, his two brothers Scott and James Davis, and their friend Anthony Morrow, were interviewed at the Youngstown Police Department regarding the fire as the 911 call reporting the fire was placed from the Davis house. Appellant confessed to starting the fire. He stated that he was angry with Julius and Ricky for stealing his cell phone. He was subsequently arrested. The next day, police interviewed appellant again and once again he confessed, this time stating Morrow had acted with him.

{¶5} A Mahoning County grand jury returned a 29-count indictment against appellant as follows: Counts one through six for aggravated murder, first-degree felonies in violation of R.C. 2903.01(B)(F), for the deaths of Carol Crawford, Jennifer Crawford, Ranaisha Crawford, Jeannine Crawford, Alisha Crawford, and Brandon Owens; Counts seven through ten for aggravated murder, first-degree felonies in violation of R.C. 2903.01(C)(F), for the deaths of Ranaisha Crawford, Jeannine Crawford, Alisha Crawford, and Brandon Owens; Counts 11 through 29 for aggravated arson, first-degree felonies in violation of R.C. 2909.02(A)(1)(B)(1)(2),

one count going to each of the household members and one count going to each of the firefighters who were put at risk responding to the fire.

{¶6} Counts one through ten also carried these death penalty specifications: The offense was part of a course of conduct involving the purposeful killing or attempting to kill two or more persons by the offender contrary to R.C. 2929.04(A)(5); The offense was committed while appellant was committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated arson and appellant was the principal offender in the commission of aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation and design contrary to R.C. 2929.04(A)(7).

{¶7} And counts three through ten carried an additional death penalty specification: in the commission of the offense appellant purposely caused the death of another who was under 13 years of age at the time and appellant was either the principal offender in the commission of aggravated murder or, if not the principal offender, committed the offense of aggravated murder with prior calculation and design contrary to R.C. 2929.04(A)(9).

{¶8} The matter was set for a jury trial. Appellant filed numerous pretrial motions including a motion to suppress the statements he made to police, alleging that they were taken in violation of his Fourth and Fifth Amendment rights. The court held a hearing on appellant's motion. It subsequently denied the motion to suppress, finding that appellant was given his *Miranda* warnings, that he understood them, that he had prior knowledge of these rights, and that he knowingly, intelligently, and voluntarily waived them before making his statements to police.

{¶9} Plaintiff-appellee, the State of Ohio, filed a pretrial motion to introduce other acts evidence. It wished to introduce Enrique Ayala's testimony that appellant and his brothers had set fire to his house less than a month prior to the alleged crimes in this case. Appellant filed a response asking the court to exclude any evidence relating to other acts, wrongs, or uncharged misconduct. The court held a

hearing on these motions as well. It overruled the state's motion to introduce other acts, finding the proposed evidence was more prejudicial than probative.

{¶10} The matter proceeded to trial. The state renewed its request to present the other acts evidence. This time the court allowed the evidence. The state presented 23 witnesses. Prior to closing arguments, appellant moved to dismiss counts seven through ten (the second set of aggravated murder charges for the death of Ranaisha Crawford, Jeannine Crawford, Alisha Crawford, and Brandon Owens) and merge them with counts three through six as they involved the same victims. The state agreed to merge these charges as being duplicative.

{¶11} The jury found appellant guilty of the six remaining aggravated murder counts and the 19 aggravated arsons counts. It also found him guilty of the principal offender specification. However, it found him not guilty of the purposeful killing specification and the purposeful causing the death of another who was under age 13 specification. The court entered judgment on the verdicts.

{¶12} The case next proceeded to the penalty phase. After listening to the evidence, the jury chose not to recommend death and instead returned a verdict recommending that appellant be sentenced to life in prison without parole eligibility for 30 years on each of counts one through six.

{¶13} The case then proceeded to a sentencing hearing. On appellant's motion, the court merged counts 11 through 16 with counts one through six. Therefore, the court did not sentence appellant on counts 11 through 16. On each of the six aggravated murder counts, the court sentenced appellant to life in prison without parole eligibility for 30 years, to run consecutively. For the remaining 13 counts of aggravated arson, the court sentenced appellant to ten years on each count, to run consecutively to one another and consecutively to the sentences on the aggravated murder counts, for a total of 310 years in prison.

{¶14} Appellant filed a timely notice of appeal on November 25, 2008. He now raises six assignments of error, the first of which states:

**{¶15}** "APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION AND OVERRULED HIS MOTION TO SUPPRESS HIS STATEMENTS CONTRARY TO THE PROTECTIONS OF THE FOURTH AND FIFTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 AND ARTICLE 14 OF THE OHIO CONSTITUTION."

**{¶16}** Appellant argues that police illegally seized and arrested him and took his statement in violation of *Miranda v. Arizona*. Appellant asserts the police seized him when they handcuffed him at his home and transported him to the police station for questioning. Appellant points to his testimony that he believed he was under arrest when police handcuffed him at his house. Appellant further notes that there was no warrant for his arrest when police transported him to the police station. Next, appellant claims there was no probable cause to arrest him at the time the police handcuffed him. And he asserts that he was pressured into giving his statement because he did not complete high school, was not given a meaningful opportunity to consider his rights, and was told that if he did not cooperate with the police his brothers would be arrested. In conclusion, appellant argues that the trial court failed to consider the totality of the circumstances regarding how his statements were obtained and instead focused only on his signature on the waiver of rights form.

**{¶17}** Our standard of review with respect to a motion to suppress is first limited to determining whether the trial court's findings are supported by competent, credible evidence. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372 at ¶8 citing *State v. Fanning* (1982), 1 Ohio St.3d 19. Such a standard of review is appropriate as, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Venham* (1994), 96 Ohio App.3d 649, 653. An appellate court accepts the trial court's factual findings and relies upon the trial court's ability to assess the witness's credibility, but independently determines, without deference to the trial court, whether the trial court applied the appropriate legal standard. *Burnside*, 100 Ohio St.3d at ¶8, citing *State v.*

*McNamara* (1997), 124 Ohio App.3d 706. A trial court's decision on a motion to suppress will not be disturbed when it is supported by substantial credible evidence. *State v. Johnson* (2000), 137 Ohio App.3d 847, 850.

{¶18} The trial court adopted the state's statement of facts set out in its post-hearing memorandum. It made the following pertinent findings.

{¶19} An arson investigator informed Detective Kelly that several local youths were suspects in an earlier arson that had started down the street from the Crawford house and in the same manner. Detective Kelly made contact with appellant and his brothers at their Bennington Avenue home and asked Mrs. Davis if police could take her children to the station to be interviewed. According to appellant, the police simply told him to "come here" and then handcuffed him and took him to the station. Appellant also stated that his mother told him to go with the police. At this time, no one was a suspect in the Crawford fire and no one was arrested, but Detective Kelly thought one or more of the Davis's might have information since the 911 call reporting the fire came from the Davis house. The only time police spoke to appellant at his house was to ask him to accompany them to the station.

{¶20} At the station, appellant was the last to be interviewed. The others all stated that "Mike did it." Detectives then interviewed appellant. Before starting the interview, the detectives turned on a recording device and read appellant his *Miranda* rights. Appellant not only indicated that he understood his rights and signed the waiver form, he also indicated that he was familiar with his rights from prior juvenile trouble he had. Appellant's testimony confirms this.

{¶21} Detective Kelly never threatened appellant or promised him anything. Appellant's testimony confirms that he was not threatened. Further, Detective Kelly did not tell appellant that his mother would be held or his family separated. Appellant was not handcuffed or restrained during the interview. After appellant waived his rights, the interview took place during which appellant confessed to setting the fire. After the interview, Detective Kelly obtained an arrest warrant and placed appellant under arrest.

{¶22} The next day, at Mrs. Davis's request, Detective Kelly interviewed appellant again at the jail. Before interviewing him, the detective read appellant his rights and appellant again indicated that he understood and waived his rights. Once again, appellant confessed to starting the fire.

{¶23} In addition to those findings adopted from the state, the court found that police transportation to the police station for interviewing was necessary because the Davis family had no transportation available to them.

{¶24} The evidence at the suppression hearing supports the trial court's factual findings.

{¶25} Detective Kelly testified for the state. Detective Kelly stated that upon arriving at the scene, he learned that appellant's brothers, Scott and James, had been suspects in a previous arson in the neighborhood. (Sup. Tr. 12-13). Additionally, he learned that the 911 call reporting the fire came from their house. (Sup. Tr. 14, 47-48). So he went to the Davis house to talk to them. (Sup. Tr. 12-14). He stated that appellant and Morrow were there too. (Sup. Tr. 13). Detective Kelly testified that some of them could have been witnesses. (Sup. Tr. 14). Detective Kelly asked Mrs. Davis if he could take appellant and his brothers to the police station to interview them. (Sup. Tr. 13). He asked her permission because Scott and James were juveniles; however, appellant was 18. (Sup. Tr. 17). She agreed and the violent crimes task force officers transported the Davis brothers and Morrow to the police station. (Sup. Tr. 13-14). The task force vehicles are leased Blazers that do not have bars typical of a police cruiser or doors that do not unlock from the backseat. (Sup. Tr. 28, 34). At this point, Detective Kelly stated, no one was a suspect and no one was arrested. (Sup. Tr. 14). He further stated he had no probable cause to arrest appellant. (Sup. Tr. 32). And he stated that Mrs. Davis and her daughter came to the station as well. (Tr. 14).

{¶26} At the police station, everyone was interviewed separately. (Sup. Tr. 15). Mrs. Davis was present at the station with her sons. (Sup. Tr. 17). Detective Kelly testified that no one was handcuffed while waiting to be interviewed. (Sup. Tr.

26). Detective Kelly stated that each of the other three boys implicated appellant. (Sup. Tr. 15-16). Before interviewing appellant, Detective Kelly read appellant his *Miranda* rights. (Sup. Tr. 18). He stated that appellant indicated that he understood his rights and he signed the waiver. (Sup. Tr. 19-20). He stated that appellant even indicated that he was familiar with his rights from juvenile trouble that he had. (Sup. Tr. 19). Detective Kelly stated that at no time did he threaten appellant or tell him that he was going to separate his family if he did not make a statement. (Sup. Tr. 21). He further stated that appellant never asked to stop the interview or to have an attorney. (Sup. Tr. 21). Detective Kelly stated that, after completing the interview, he placed appellant under arrest. (Sup. Tr. 22-23).

{¶27} Detective Kelly first testified that no one was handcuffed while they were transported to the police station or while they waited to be interviewed. (Sup. Tr. 28). However, he later stated that he was unsure if anyone was handcuffed during the ride to the police station. (Sup. Tr. 29, 34-35).

{¶28} Detective Kelly further testified that the day after appellant's arrest, Mrs. Davis called and informed him that somebody else may have been involved with appellant and asked if he could interview appellant again. (Sup. Tr. 23). Detective Kelly stated that he went to see appellant in jail and once again read appellant his *Miranda* warnings and appellant once again indicated he understood his rights and signed the waiver. (Sup. Tr. 23-24).

{¶29} Appellant also testified. He stated that the police came to his house and handcuffed him. (Sup. Tr. 52-53). He stated the police handcuffed his brothers also. (Sup. Tr. 54). The police then asked his mother if they could take him to the station and she said yes even though he was 18 at the time. (Sup. Tr. 53). Appellant testified that he and Morrow rode in a task force vehicle with two officers. (Sup. Tr. 54). Appellant stated that he never told the officers that he did not want to go with them because his mom had told him he had to go. (Sup. Tr. 58). He stated that after he got to the police station he was un-handcuffed and brought into the interview room. (Sup. Tr. 53-54). Appellant testified that he never told the officers

that he did not want to make a statement and he told them that he knew his rights. (Sup. Tr. 59). He further stated that the police never threatened him. (Sup. Tr. 60-61).

{¶30} Additionally, appellant testified that he thought he was under arrest when the police handcuffed him at his house. (Sup. Tr. 63). However, he admitted that they did not tell him that he was being charged with anything. (Sup. Tr. 63). And he admitted that the only way for him to get to the police station was for the officers to give him a ride because his family did not have a car at the time. (Sup. Tr. 63-64).

{¶31} The DVD recordings of appellant's interviews corroborate much of Detective Kelly's testimony. The DVD of the first interview revealed that appellant was not handcuffed at the time of the interview. Further, when the detectives told appellant they needed to read him his rights, he stated that he already knew his rights from "juvenile." One of the detectives then read appellant his rights. Appellant signed an acknowledgement of his rights and he also signed a waiver of his rights. Additionally, appellant told the detectives that he barely made it to the eleventh grade. The DVD of the second interview showed one of the detectives reading appellant his rights again and appellant again acknowledging his rights. In both interviews, appellant did not make any statements prior to listening to, acknowledging, and waiving his *Miranda* rights.

{¶32} Because the trial court's factual findings are supported by competent, credible evidence, we must move on to determine whether the trial court applied the appropriate legal standard. The trial court found:

{¶33} "[I]t's patently clear that Defendant was given his Miranda warnings, that he understood them, that he had prior knowledge of these rights through previous encounters with police in the juvenile justice system and that he knowingly, intelligently and voluntarily waived those rights and gave two statements to the police. At no time did Defendant request counsel. At no time was Defendant threatened by the Police or promised anything in return for his statement. Defendant was not coerced, bullied, tricked, or in any way abused by the Police during the

taking of either of his statements. There is nothing in the record that indicates Defendant is mentally ill or in any way incapable of understanding his rights and waiving them." (Sept. 2, 2008 Judgment Entry).

**{¶34}** The trial court went on to address appellant's argument that the police handcuffing him at his house before transporting him to the police station was an illegal arrest. The court found that it was proper protocol to handcuff persons unknown to the officers when transporting them for questioning due to the possibility that the persons they are transporting could be a danger to the officers or themselves. For the officers' safety, as well as for the safety of the persons being transported, the court found handcuffing to be a proper precautionary measure that is minimally intrusive. The court further noted that because appellant was handcuffed he was in some form of custody, but found that such custody was not illegal under the totality of the circumstances. Finally, the court found that appellant's *Miranda* rights were unequivocally preserved until appellant waived them.

**{¶35}** Appellant makes two arguments: (1) the police illegally arrested him at his house and (2) he was pressured into giving his statement at the police station. We will address his arguments in reverse order.

**{¶36}** The waiver of the right not to incriminate oneself, and any subsequent confession, must be made voluntarily, knowingly, and intelligently. *State v. Shakoor*, 7th Dist. No. 01-CA-121, 2003-Ohio-5140, citing *Miranda v. Arizona* (1966), 384 U.S. 436. In deciding whether a defendant's confession was induced involuntarily, the court should consider: the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards* (1976), 49 Ohio St.2d 31, 40-41, overruled on other grounds.

**{¶37}** Appellant's actual confession at the police station was voluntarily given and in accordance with *Miranda*. The detectives read appellant his rights. Appellant stated that he understood his rights, told police that he was familiar with these rights

from prior experience, and signed an acknowledgement of the rights. Appellant then signed a waiver of his *Miranda* rights. "[E]vidence of a written waiver form signed by the accused is strong proof that the waiver is valid." *State v. Eley* (1996), 77 Ohio St.3d 174, 178, superseded by constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89. Appellant was 18 years old. Appellant stated that he barely made it to eleventh grade, which means that he completed the tenth grade. Additionally, there is no indication that appellant was confused or that the explanation of *Miranda* rights was beyond his grasp. Furthermore, the detectives did not threaten appellant or make him any promises in exchange for his statement. And there is absolutely no evidence of physical deprivation or mistreatment.

{¶38} Likewise, appellant's confession the next day during his jailhouse interview was voluntarily given and in accordance with *Miranda.* The detectives once again read appellant his rights, appellant acknowledged them, and waived them. Furthermore, this interview was initiated by a request from appellant's mother. And like the first interview, there is no evidence of threats, promises, or mistreatment by police.

{¶39} The question arises then whether appellant's voluntary statements made in full compliance with *Miranda* should have been suppressed based on an illegal arrest, if in fact, appellant was illegally arrested when police transported him to the police station. So we must examine whether appellant was under arrest when police brought him to the station for questioning.

{¶40} The trial court believed appellant's testimony that he was handcuffed when he was transported to the police station. It found that because appellant was handcuffed he was in some form of custody. However, the court stopped short of saying that appellant was under arrest.

{¶41} An arrest occurs when four elements are met: "(1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." *State v. Darrah* (1980), 64 Ohio St.2d 22, 26. Moreover, an arrest

signifies an individual's apprehension or the restraint of a person's freedom in contemplation of the formal charging with a crime. Id.

{¶42} Considering these elements, appellant was not under arrest when police transported him to the station for questioning. While some of the arrest elements are met, others are not.

{¶43} First, there was no intent to arrest appellant. Detective Kelly testified that no one was a suspect at the time he asked appellant, his brothers, and Morrow to come to the station for questioning. He further stated that no one was arrested at that time. And he stated that he had no probable cause to believe that appellant was a suspect at that time. Detective Kelly stated that even Mrs. Davis and her daughter came to the station.

{¶44} Second, while the police presence certainly was a show of authority, it did not accompany an intent to arrest. And other than handcuffing appellant, the facts do not reflect an arrest. Appellant stated that he went with the police because his mother told him he had to go, not because the police ordered him or forced him. He never told the police that he did not want to go. There was no testimony that the officers patted appellant down or told him that he was under arrest. And there was no testimony that the officers brandished their weapons. Further, the task force vehicle in which appellant rode was not a police cruiser with a cage and back doors that did not unlock. Instead, it was an SUV without a cage and its doors could be unlocked from the backseat.

{¶45} Third, there was an actual detention of appellant by police when they handcuffed him.

{¶46} Fourth, appellant testified that he believed he was under arrest. However, he admitted that the police did not tell him he was being charged with anything. And he admitted his family did not have a vehicle. So the only way for him to get to the police station was by riding with the officers. Furthermore, appellant's handcuffs were removed when he got to the station. And appellant's mother was with him at the station.

**{¶47}** Given these circumstances, appellant was not under arrest when the police handcuffed him to give him a ride to the station for questioning. Handcuffing alone does not create an arrest as long as the handcuffing was reasonable under the circumstances. *State v. Pickett* (Aug. 3, 2000), 8th Dist. No. 76295, citing *State v. Mays* (1995), 104 Ohio App.3d 241, 248-49; *State v. Broomfeld* (Sept. 13, 1996), 2d Dist. No. 95-CA-0103*; United States v. Miller* (C.A.8, 1992), 974 F.2d 953, 956-57; *United States v. Glenna* (C.A.7, 1989), 878 F.2d 967; *United States v. Crittendon* (C.A.4, 1989), 883 F.2d 326; *United States v. Laing* (C.A.D.C.1989), 889 F.2d 281. In this situation where officers were transporting potential arson witnesses to the police station for questioning, handcuffing was reasonable both for the officers' safety as well as for the witnesses' safety. The officers would have had no way of knowing if the witnesses were a threat to their safety or to each other's safety.

**{¶48}** And in *State v. Whitfield*, 2d Dist. No. 22432, 2009-Ohio-293, a similar situation occurred. Whitfield testified at a suppression hearing that four armed police officers came to his home and told him that they needed to take him to the police station for questioning. Whitfield agreed to go with them. He stated that he was handcuffed behind his back, placed in the rear of a marked police cruiser, and transported to the police station where he was interviewed. Police did not give Whitfield his *Miranda* warnings prior to the interview. The detective who interviewed Whitfield testified that Whitfield was a witness, not a suspect, and that Whitfield was not charged with anything at the time. The Second District found that Whitfield had been significantly deprived of his freedom of movement and therefore, *Miranda* warnings were required. Id. at ¶61. The court then went on to comment:

**{¶49}** "*There may be valid reasons why any person, including a mere witness, is secured in handcuffs before being placed in a police cruiser*. Officer safety is a prime consideration. In that event, explaining the need to employ handcuffs might lessen the custodial character of the person's encounter with police. That was not done here. Neither were the cuffs removed when Defendant emerged from the cruiser, and not until he was led into the police station and placed in the interview

room. Those matters, following Defendant's apprehension at home by four armed police officers, demonstrate a custodial detention that required *Miranda* warnings before any interrogation commenced." (Emphasis added.) Id. at ¶63.

**{¶50}** The court concluded that due to the lack of *Miranda* warnings, Whitfield's statements should have been suppressed. Thus, the court seemed to conclude that had the detective who interviewed Whitfield read him his *Miranda* warnings, Whitfield's statements would have been admissible. In the case at bar, Detective Kelly gave appellant his *Miranda* warnings before interviewing him.

**{¶51}** In conclusion, because appellant was not illegally arrested and because appellant's *Miranda* rights were not violated, the trial court properly overruled appellant's motion to suppress his statements. Accordingly, appellant's first assignment of error is without merit.

**{¶52}** Appellant's second assignment of error states:

**{¶53}** "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION TO EXCLUDE EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS AND PERMITTING AT TRIAL WITNESS TESTIMONY CONTRARY TO OHIO RULES OF EVIDENCE 402 AND 403(A), WHEN SUCH EVIDENCE WAS IMPROPER, INCOMPETENT AND ITS ADMISSION OUTWEIGHED THE DANGER OF PREJUDICE TO APPELLANT RECEIVING A FAIR TRIAL."

**{¶54}** Early on in the pretrial process, appellant filed a motion to exclude evidence relating to other crimes, wrongs, or acts. The trial court sustained this motion on May 16, 2008. Then on September 12, 2008, appellee filed a motion to introduce other acts evidence. The state alleged that it was admissible because it established absence of mistake or accident, intent, modus operandi, and plan. The court conducted a hearing on this motion and ultimately denied it finding that the evidence was "far more prejudicial than probative" and that it was "the type of evidence that creates passion, creates prejudice against the defendant." (Sept. 22, Tr. 55-56). Finally, on the second day of trial, October 10, 2008, appellee renewed

its motion arguing appellant's counsel had put appellant's identity at issue and it should be permitted to use the other acts evidence to prove his identity. This time, the court granted the motion and allowed the testimony over appellant's objection. (Tr. 1590).

**{¶55}** All of these motions dealt with appellant's attempt to prohibit the state from presenting Enrique Ayala's testimony. Ayala would testify that three weeks prior to the arson in question, appellant and his brothers set a fire on his front porch on the same street as the Crawford home.

**{¶56}** Appellant argues that the trial court should not have allowed Ayala's testimony because it was unfairly prejudicial to him. He claims that this testimony was only meant to show that he was the type of person who committed arson, which he states is not permissible under the Evidence Rules. He further argues that Ayala's testimony did nothing to make the existence of any fact of consequence in this case more or less probable. He urges that the prejudice was even more likely since Ayala could not independently identify him.

**{¶57}** A trial court has broad discretion in determining whether to admit or exclude evidence and its decision will not be reversed absent an abuse of discretion. *State v. Mays* (1996), 108 Ohio App.3d 598, 617. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157.

**{¶58}** "Relevant evidence" is any evidence that tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. Generally, all relevant evidence is admissible. Evid.R. 402. Relevant evidence may be inadmissible, however, if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403.

**{¶59}** Evidence of prior bad acts is inadmissible for proving that the accused acted in conformity with his bad character. *State v. Treesh* (2001), 90 Ohio St.3d

460, 482; Evid.R. 404(B). Yet evidence of prior bad acts may be admitted for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B).

**{¶60}** In this case, the state offered Ayala's testimony to prove appellant's identity.

**{¶61}** "'Where the identity of the defendant is the question in issue, any fact which tends to establish the identity has probative value and is none the less competent evidence because it establishes a collateral fact nor because proof of such fact may incidentally involve proof of the commission of another offense. If the fact tends to establish the identity of the accused, it is competent evidence, no matter what else it may prove.'" *State v. Jamison* (1990), 49 Ohio St.3d 182, 185, quoting *Barnett v. State* (1922), 104 Ohio St. 298, 303. Other acts can be used to prove identity through a common modus operandi by showing that the accused has committed similar crimes and used a distinct, identifiable scheme, plan, or system as was used in the commission of the charged offense. *State v. Elersic*, 11th Dist. Nos. 2001-G-2335, 2003-G-2512, 2003-Ohio-7218, at ¶26.

**{¶62}** But courts must be careful to recognize the distinction between evidence that shows that the defendant *is the type* of person who might commit a particular crime and evidence that shows that the defendant *is* the person who committed a particular crime. *State v. Lowe* (1994), 69 Ohio St.3d 527, 530. Evidence of a certain modus operandi is admissible "because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character." Id. at 531.

**{¶63}** Here the other-acts evidence tends to demonstrate that appellant is the person who started the fire at issue instead of merely showing that he is the type of person who might commit arson. Hence, the evidence was relevant. The fire at Ayala's house and the fire at the Crawford house were set under very similar

circumstances. Ayala testified that the fire at his house was set in the early morning hours, on the front porch, and using an accelerant. (Tr. 1607-08). Further, Ayala's house, like the Crawford house, was on Stewart Avenue. (Tr. 1604). And the fire at Ayala's occurred approximately one month prior to the Crawford fire. (Tr. 1604).

**{¶64}** Nonetheless, the probative value of this evidence was outweighed by the danger of unfair prejudice. Ayala's testimony as to who was responsible for the fire was somewhat doubtful. When asked who set his house on fire, Ayala first replied, "Some guy named David [sic.]" (Tr. 1604). When asked if he could see the person in the courtroom, Ayala stated that he was not sure because he could not see very far. (Tr. 1604). Thus, he did not identify appellant either in the courtroom or by his first name. Ayala stated, however, that all three Davis brothers who lived a block away from him were responsible for setting his house on fire. (Tr. 1605-1606). He testified that he saw them do it from his living room. (Tr. 1607-1608).

**{¶65}** The trial court, during its two pretrial opportunities to rule on this evidence, unequivocally found that it was "far more prejudicial than probative" and that it was the kind of evidence that would prejudice the jury against appellant. The court's reasons for initially denying the state's request to admit the evidence were still sound and still existed at the time of trial.

**{¶66}** Given the prejudicial nature of the evidence and given Ayala's uncertain identification, the trial court should not have admitted Ayala's testimony.

**{¶67}** Yet this is not a reversible error. If there is no reasonable possibility that the improper other-acts evidence contributed to the defendant's conviction, then its admission is harmless error. *State v. Elliot* (1993), 91 Ohio App.3d 763, 771.

**{¶68}** As will be seen in appellant's next assignment of error, the rest of the evidence clearly support appellant's convictions. Most importantly, appellant confessed to setting the fire at the Crawford house and then running home to call 911. He also described to the police his motive for setting the fire, which was corroborated by other witnesses. Further, arson investigators determined that an accelerant was used to start the fire. And a chemical commonly found in accelerants

was detected on appellant's clothing.  Thus, even though it was error to admit Ayala's testimony, such error was harmless.

**{¶69}** Accordingly, appellant's second assignment of error is without merit.

**{¶70}** Appellant's third assignment of error states:

**{¶71}** "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTIONS FOR AGGRAVATED MURDER AND AGGRAVATED ARSONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY AND TRIAL COURT'S VERDICT WERE INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."

**{¶72}** Here appellant argues that the jury's verdict was against the manifest weight of the evidence.  He contends that the state's theory of the case that he purposely set fire to the Crawford home because he was upset that Ricky Williams stole his cell phone was unsubstantiated.  Appellant first points us to the testimony of Julius Crawford, his good friend, who he states testified that it was unlikely that appellant would set his house on fire over a stolen cell phone.  Second, appellant asserts that the Youngstown Police Department's and the arson investigators' investigations were incomplete.  As to the police, he notes that Detective Kelly testified that he would have liked to have known that James Davis had called Julius Crawford at 4:00 a.m. to see if he was still awake.  And as to the arson investigators, appellant notes that they failed to remove a separate portion of the porch to provide a comparative sample for accelerant testing and failed to submit for testing a can of lighter fluid found in the kitchen of appellant's home.  Appellant argues that had these avenues been pursued, the investigation would have focused on Anthony Morrow and James Davis.  Finally, appellant argues that no scientific evidence linked him to the crimes.  He notes that the only footprints found nearby were determined to have been made by Morrow's boots.  Further, he states that although accelerants were found on the Crawford porch and on clothing taken from him, James Davis, and Morrow, there was no evidence that the accelerants were the same.

**{¶73}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.

**{¶74}** Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.

**{¶75}** The jury convicted appellant of six counts of aggravated murder in violation of R.C. 2903.01(B), which provides:

**{¶76}** "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated arson, arson, * * *."

**{¶77}** The jury also convicted appellant of 19 counts of aggravated arson in violation of R.C. 2909.02(A)(1), which provides, "[n]o person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender[.]"

**{¶78}** Appellant's argument here is that the state did not prove that he was the one who set the fire. In order to determine if the jury clearly lost its way in finding that appellant was the one who set the fire, we must examine the evidence.

**{¶79}** Retia Crawford testified about her family and her escape from the fire. She testified that on January 22, 2008, she lived at 1645 Stewart Avenue with her mother Carol Crawford; her sister Jennifer Crawford; her three nieces, Jeannine,

Alisha, and Ranaisha Crawford; her nephew Brandon Owens; her brother Julius Crawford; and her brother's friend Christopher Taylor. (Tr. 1157-58). In addition to her family, that night family friends Ricky Williams and Domika Wilson also stayed at the Crawford house. (Tr. 1159). Retia stated that while Domika was not Julius's girlfriend, Domika was "with" Julius. (Tr. 1172). She stated that Taylor woke her up from her basement bedroom to tell her the house was on fire. (Tr. 1162). Retia tried to go upstairs to get the others but the fire was too hot so she ran out of the house with Taylor. (Tr. 1163). Retia stated that initially, a detective told her that someone by the name of "Face" started the fire. (Tr. 1172).

{¶80} Julius Crawford testified that prior to January 22, there was an issue regarding appellant's cell phone. (Tr. 1177). Julius stated that he and Ricky Williams went to appellant's house and Ricky stole appellant's cell phone. (Tr. 1177-78). He also stated that he offered to buy it from Ricky. (Tr. 1178). Julius stated that he thought appellant realized his phone was stolen but Julius was unsure whether appellant suspected that it was him or Ricky who took it. (Tr. 1178). Julius stated that later appellant repeatedly asked him to get the phone back for him. (Tr. 1179). He also stated that appellant was upset about his phone. (Tr. 1187).

{¶81} Julius also testified that he and appellant were good friends and spent a lot of time together. (Tr. 1185). In fact, he stated that appellant came over just that day while he was outside and they talked about playing football. (Tr. 1180). Additionally, Julius testified that at 4:00 a.m. the morning of the fire appellant's brother James called him and asked him if he was still awake. (Tr. 1189). Finally, Julius testified that a person by the name of "Face" was discussed as a person of interest in setting the fire. (Tr. 1189). He stated that Face is Domika's ex-boyfriend. (Tr. 1189-90).

{¶82} Ricky Williams testified that a few days prior to the fire, he and Julius were at appellant's house playing with appellant's new cell phone. (Tr. 1196-97, 1210). Ricky stated that he put the phone in his waistband while appellant was in the kitchen. (Tr. 1196). He stated that appellant looked in his pockets and did not find it.

(Tr. 1196). Ricky stated that after they left appellant's house, he told Julius that he had appellant's phone. (Tr. 1197). And he testified that appellant never confronted him about the phone or threatened him. (Tr. 1210-11). He also admitted that the cell phone was found in his house five days after the fire. (Tr. 1204-1205).

{¶83} Domika Wilson testified that on the night of the fire she was sleeping in Julius's room with him when somebody yelled that there was a fire. (Tr. 1219). Domika further testified that Face is her ex-boyfriend. (Tr. 1222-23). And she stated that Face knew that she was seeing Julius. (Tr. 1224). She stated that she saw Face later on the morning of the fire and he drove her to the hospital. (Tr. 1223).

{¶84} Youngstown Police Officer Lou Ciavarella testified that upon searching appellant's house he found a can of charcoal lighter fluid in the kitchen. (Tr. 1252).

{¶85} Detective Sergeant Joseph DeMatteo testified that he observed footprints about 75 feet behind the Crawford house that appeared to be made by someone who was walking as opposed to running. (Tr. 1273-74). He found them between 11:00 a.m. and 12:00 p.m. the afternoon following the fire. (Tr. 1274-75).

{¶86} Crime Lab Officer Robert Mauldin testified that he confiscated appellant's pants and shoes (red and white Jordan tennis shoes) and gave them to the State Fire Marshal. (Tr. 1294-95).

{¶87} Detective Kelly testified that he identified appellant as a person of interest or a witness. (Tr. 1312, 1337). He stated that he went to appellant's house after the fire and spoke to Mrs. Davis. (Tr. 1312-13). The violent crimes task force then brought appellant, Scott Davis, James Davis, and Anthony Morrow to the police station for questioning. (Tr. 1313, 1336-37).

{¶88} During the interview, Detective Kelly stated appellant initially denied being involved in the fire. (Tr. 1317). Appellant told Detective Kelly about his stolen cell phone and that he thought Ricky took it. (Tr. 1318). Appellant indicated that he was angry because Julius was his best friend and he felt betrayed that Julius and Ricky would have something to do with stealing his phone. (Tr. 1319, 1345).

**{¶89}** Appellant then admitted to setting the fire at the Crawford house. (Tr. 1319). He told Detective Kelly that he left his house, walked through the yard and through a vacant lot, picked up a piece of paper and balled it up. (Tr. 1320). Appellant stated that he then lit the paper on fire in the Crawfords' driveway. (Tr. 1320). The next thing he knew, appellant told Detective Kelly, he turned to run and the house was engulfed in flames. (Tr. 1320). Appellant stated he ran home and called 911. (Tr. 1320). Appellant told Detective Kelly that he acted alone and that he did not use an accelerant. (Tr. 1320, 1322).

**{¶90}** Appellant further told Detective Kelly that he repeatedly called his cell phone that night to see if anyone was home at the Crawford house and that he believed Ricky answered it one time and hung up. (Tr. 1320-21). He stated that the reason for the fire was the stolen cell phone. (Tr. 1321).

**{¶91}** Next, appellant told Detective Kelly that he knew people were home at the Crawford house at the time he set the fire because the lights were on and he knew Julius would be up at that time. (Tr. 1321). He also stated that he told his mother that he had set the fire. (Tr. 1321-22).

**{¶92}** The next day, Detective Kelly interviewed appellant again. (Tr. 1322). Detective Kelly stated that Mrs. Davis had called him and this led to the second interview. (Tr. 1323). This time appellant stated that he did not act alone but that Anthony Morrow was with him. (Tr. 1324). Appellant told Detective Kelly that he and Morrow had discussed setting a fire in the Crawfords' driveway in order to scare Julius. (Tr. 1324). He further told Detective Kelly that while he and Morrow were at his house, Morrow filled up a Top Pop bottle with lighter fluid and stuck a rag in it. (Tr. 1325). Appellant stated that he decided he did not want to use the pop bottle so he emptied it out of his back door and threw the Top Pop bottle in the garbage. (Tr. 1325).

**{¶93}** In an attempt to corroborate appellant's statements, Detective Kelly testified that he recovered several Top Pop bottles from appellant's garbage cans, which he sent to the State Fire Marshal for testing to see if they contained any

accelerant. (Tr. 1325-26). However, Detective Kelly testified that he found no evidence to corroborate appellant's story after the lab reports came back. (Tr. 1327).

{¶94} Detective Kelly also stated that at the scene he was given the name of "Face" as a potential suspect but that he did not find any evidence to link him to the fire. (Tr. 1314). He further testified that Face was eliminated as a suspect after appellant confessed. (Tr. 1334).

{¶95} Detective Kelly also testified that the footprints found behind the Crawford house were identified as belonging to Morrow. (Tr. 1338). However, he also stated that there was no way of knowing when the footprints were made. (Tr. 1347).

{¶96} Lieutenant Kevin Johnson of the Youngstown Fire Department responded to investigate the fire's cause. He testified that the condition of the porch floor indicated that the fire began very low to the ground. (Tr. 1363). He stated that he centered his investigation on the front porch. (Tr. 1386-87). After the fire started on the porch, Lieutenant Johnson testified, it broke through the front window and went up to the second floor. (Tr. 1369). He further testified that the charring he found in one area of the porch indicated that there was a "pooling" or a puddle of an accelerant in that spot. (Tr. 1390).

{¶97} Lieutenant Johnson also testified that the State Fire Marshall's dog indicated two areas on the porch for accelerants. (Tr. 1388-89). The dog's indication, in addition to the irregular burn pattern in those areas, caused Lieutenant Johnson to take samples of the porch flooring there. (Tr. 1389, 1391). He sent the samples to the State Fire Marshal's lab for testing. (Tr. 1390, 1392; Exs. 31, 32). He also stated that he did not take a comparative sample from the porch. (Tr. 1408). He stated that ideally a comparative sample would be taken from the unburned area, but in this case there was no unburned area. (Tr. 1415). However, he admitted that he could have taken a comparative sample from the least burned portion of the porch. (Tr. 1409). And he admitted that porches sometimes have a sealant or terpentene [sic.] within them that is ignitable. (Tr. 1410). Lieutenant Johnson testified, however,

that in the thousand fires that he had investigated he had never come across a sealed turpentine floor that ignited across the board all at once. (Tr. 1417). Thus, he opined that there was nothing about the way this fire burned across the floor so quickly that was consistent with a sealant being the cause of the fire. (Tr. 1417).

{¶98} Lieutenant Johnson testified that nothing from his investigation indicated that the fire was accidentally started. (Tr. 1394, 1399). He concluded, based on his investigation, that the fire originated on the front porch and shortly after being ignited, broke into the house and followed up the stairwell cutting off any means for people to get up or down the stairs. (Tr. 1399). Lieutenant Johnson ruled the fire arson. (Tr. 1399).

{¶99} Dr. Darin Trelka, a deputy coroner and pathologist at the Cuyahoga County Coroner's Office, testified that the cause of death for all six victims was carbon monoxide intoxication due to smoke inhalation. (Tr. 1488, 1490, 1492, 1494, 1495, 1497).

{¶100} Brian Peterman, a fire investigator for the State Fire Marshal's Office, investigated the fire along with his canine partner, Lacey. Lacey is trained to detect ignitable liquids and accelerants by scent. (Tr. 1503). At the Crawford home, Peterman deployed Lacey on the front porch where she alerted him to two spots where she detected an ignitable liquid. (Tr. 1509). Peterman then removed samples of the porch from these spots to be sent for testing. (Tr. 1509; Exs. 32, 33). Peterman also took Lacey to the Youngstown Police Department to sniff clothes that had been collected by the police. (Tr. 1511). Lacey alerted to several articles of clothing that were then sent for further testing including appellant's jeans and tennis shoes and two other pairs of shoes that did not belong to appellant. (Tr. 1512-13, 1527-28).

{¶101} On cross examination, Peterman stated that Lacey cannot distinguish between different types of ignitable liquids, she can only determine that an ignitable liquid is present. (Tr. 1518-19). And he agreed that his training manual states that a comparison sample should be taken; however, he stated that the manual was just a

guide. (Tr. 1520). Peterman further opined that a comparison sample is not always necessary. (Tr. 1520). He stated that if he were to take a comparison sample it would be from an unburned portion of the porch. (Tr. 1529). But he stated that in this case the whole porch was burnt. (Tr. 1529). Finally, Peterman testified that if the porch had been stained or varnished years ago and that stain had fueled the fire then Lacey would have alerted over the entire porch, which was not the case. (Tr. 1529-30).

{¶102} Christa Rajendram is the lab supervisor at the State Fire Marshal Crime Lab who tested the items submitted by the Youngstown Fire Department. Rajendram tested the two samples taken from the Crawfords' porch. She found medium petroleum distillate and terpenes present. (Tr. 1538). Terpenes are a substance that are found in soft woods as a natural product and are also present in turpentine. (Tr. 1538). Medium petroleum distillates are found in ignitable liquids such as paint thinners, charcoal starters, and lamp oils. (Tr. 1539). Rajendram also tested the clothing submitted by the YFD. She stated that seven articles of clothing tested positive for medium petroleum distillates: three pairs of shoes, two pairs of pants, and two shirts. (Tr. 1540, 1546-47). Included in these items that tested positive were appellant's tennis shoes and his jeans. (Tr. 1540).

{¶103} On cross examination, Rajendram testified that not all charcoal lighter fluids contain medium petroleum distillates. (Tr. 1555). And she testified that while she was able to tell that the medium petroleum distillates on the porch and on the clothes were in the same range, she could not determine whether they were the same medium petroleum distillates or whether they came from the same product. (Tr. 1557-58). Finally, she testified that a comparative sample from the porch would have helped her determine if any medium petroleum distillates were present in the wood of the porch. (Tr. 1559).

{¶104} Additionally, eight firefighters testified that they went into the burning house while it was still dangerous, that they were at a risk of serious harm, and that they suffered various injuries as a result. (Tr. 1418-60).

**{¶105}** Appellant called one witness in his defense, Dr. Richard Henderson, a certified fire investigator. Dr. Henderson reviewed the lab reports and results from the tests done at the State Fire Marshal's Lab.

**{¶106}** Dr. Henderson stated that one thing that concerned him was that anytime a wood floor is involved, like the porch here, he worries about whether the medium petroleum distillate came from the floor itself. (Tr. 1694). He explained that a wood floor can be painted or stained with medium petroleum distillate-containing products. (Tr. 1695). And he stated that the medium petroleum distillates can stay locked in the wood for decades. (Tr. 1695). Dr. Henderson testified that in order to determine whether the medium petroleum distillates came from the wood flooring, a comparative sample should be taken for testing. (Tr. 1695). Ideally, Dr. Henderson stated that an unburned sample should be used. (Tr. 1695). But when that is not possible, he stated that a sample should be taken from the least-burned area. (Tr. 1695). Dr. Henderson opined that a comparison sample is helpful in eliminating the theory that a medium petroleum distillate was purposely placed as an ignitable fluid to start a fire. (Tr. 1696).

**{¶107}** Another concern Dr. Henderson expressed was that the container of charcoal lighter fluid found by police in appellant's kitchen was not tested to see if its chemical composition was similar to the material found on the porch samples. (Tr. 1698-99). He explained further that older charcoal lighter fluids commonly contained medium petroleum distillates but that newer ones do not. (Tr. 1699-1700).

**{¶108}** Dr. Henderson further testified regarding all of the clothing that was found to have medium petroleum distillates on them. He stated that there is no way to tell if the medium petroleum distillates on the clothes all came from the same source because the same material is used in so many different products. (Tr. 1706-1707). Some of the products that contain medium petroleum distillates that Dr. Henderson listed are charcoal lighter fluid, lamp oil, insect products like Raid, and waterless hand cleaners. (Tr. 1707).

**{¶109}** Additionally, Dr. Henderson testified that after comparing the fine structure of the porch samples with the clothing submitted, he concluded that they did not contain the same medium petroleum distillates. (Tr. 1712, 1736).

**{¶110}** On cross examination, Dr. Henderson stated that he did not conduct an independent investigation, he only reviewed the records produced by the state investigators. (Tr. 1717). He also admitted that the chemical analyses performed by the state lab were done properly. (Tr. 1718). And Dr. Henderson opined that in a case where the porch was stained years ago and then the porch combusted within minutes, while the stain components would be detectable in the porch, the stain would not have contributed to the fire. (Tr. 1733).

**{¶111}** It was undisputed that six people died of carbon monoxide poisoning from smoke inhalation and that the fire subjected 13 others to a substantial risk of serious physical harm. The main question at trial was whether appellant was the individual responsible for starting the fire. The manifest weight of the evidence proved that he was.

**{¶112}** First and foremost, appellant confessed not once, but twice, to starting the fire. And while his defense team tried to suggest that someone else started the fire, appellant offered no explanation for why he would have confessed to starting a fire that killed six people if he had not been responsible.

**{¶113}** Additionally, the evidence demonstrated that appellant was upset that Ricky Williams, while hanging out with Julius Crawford and appellant, stole appellant's cell phone. Appellant told Detective Kelly that he was angry because Julius was his best friend and he felt betrayed that Julius and Ricky would have something to do with stealing his phone. Appellant stated that this was the reason he set the fire. Julius and Ricky corroborated appellant's statements about the stolen cell phone. And police found the cell phone in Ricky's house five days after the fire.

**{¶114}** Further, the evidence showed that the 911 call reporting the fire was placed from appellant's house. And appellant told Detective Kelly that after setting the fire, he ran home and called 911.

{¶115} Moreover, the evidence indicated that an accelerant was used to start the fire. Lieutenant Johnson testified that he found "pooling" indicative of an accelerant on the porch. And fire investigator Peterman testified that the accelerant-sniffing dog indicated an accelerant on two areas of the porch. Testing on these samples came back positive for medium petroleum distillates, which are found in many accelerants. Appellant attempted to use Dr. Henderson's testimony to show that even though medium petroleum distillates were found in the porch samples, they could have been there as a result of a stain or paint used on the porch. However, all experts who testified on the subject, including Dr. Henderson, opined that even if there were medium petroleum distillates in the porch wood, they would not have caused such a rapid fire as was the case here. And Peterman testified that if the porch had been stained or varnished and the stain or varnish was the source of the accelerant, then the fire dog would have alerted over the entire porch and not just on two isolated areas.

{¶116} Medium petroleum distillates were also found on appellant's shoes and pants. Appellant downplayed the significance of this by presenting evidence that they were also found on clothing items worn by Morrow and James Davis. Further, Dr. Henderson testified that the medium petroleum distillates found on appellant's clothing were different than those found on the porch. And Rajendram, who actually performed the testing, testified that while she was able to tell that the medium petroleum distillates on the porch and on the clothes were in the same range, she could not determine whether they came from the same product. However, Dr. Henderson offered somewhat conflicting testimony because he also testified that there is no way to tell if the medium petroleum distillates on the clothes all came from the same source.

{¶117} Moreover, Lieutenant Johnson testified that his investigation revealed the fire originated on the front porch and travelled into the house shortly after being ignited. He ruled the fire arson.

**{¶118}** As to appellant's specific arguments, they do not demonstrate that the jury's verdict was against the weight of the evidence.

**{¶119}** First, Julius only testified that he and appellant were good friends and that appellant had asked him to try to get his phone back. Julius did not testify, as appellant asserts, that it was unlikely that appellant would set his house on fire.

**{¶120}** Second, while Detective Kelly did testify that he would have liked to have known that James Davis had called Julius at 4:00 a.m. and asked if he was awake (Tr. 1340), this does not detract from appellant's confession to Detective Kelly.

**{¶121}** Third, the arson investigators did not remove a comparative sample from the porch for testing and did not submit the can of lighter fluid found in appellant's house for testing. However, as discussed above, all witnesses who testified on the subject indicated that even if medium petroleum distillates were present in the porch floor from staining, they would not have ignited so quickly as to set the porch ablaze in seconds. And while it may have been helpful to test the can of lighter fluid found in appellant's house for medium petroleum distillates, even if such testing revealed that the lighter fluid did not contain medium petroleum distillates this would only serve to show that appellant did not use that particular accelerant in starting the fire.

**{¶122}** Fourth, appellant takes issue with the fact that Morrow was not charged in the arson. The evidence demonstrated that Morrow's boot print was found 75 feet behind the Crawford house and medium petroleum distillates were found on his clothing too. However, even if Morrow had aided appellant in setting the fire this would not diminish appellant's guilt. Furthermore, appellant himself gave conflicting statements to Detective Kelly on this point, first stating that he acted alone in setting the fire and the next day stating that Morrow was with him.

**{¶123}** Finally, it is true that no scientific evidence directly linked appellant to the fire. But such evidence was unnecessary. Forensic evidence is not required to prove an offense. *State v. Dickerson* (Mar. 17, 1999), 7th Dist. No. 96 C.A. 209. Moreover, medium petroleum distillates were found on appellant's clothing, although

no expert was able to conclude whether they were the same medium petroleum distillates found on the porch.

**{¶124}** In sum, we cannot conclude that the jury clearly lost its way in finding that appellant started the fire. Accordingly, appellant's third assignment of error is without merit.

**{¶125}** Appellant's fourth assignment of error states:

**{¶126}** "THE TRIAL COURT VIOLATED DUE PROCESS, ABUSED ITS DISCRETION AND ERRED TO THE PREJUDICE OF APPELLANT BY SENTENCING HIM TO THE MAXIMUM CONSECUTIVE SENTENCES FOR HIS CONVICTIONS FOR AGGRAVATED MURDER AND AGGRAVATED ARSON WITHOUT PROPERLY CONSIDERING OHIO'S SENTENCING STATUTES, INCLUDING R.C. 2929.14(E)(4) WITHOUT MAKING THE REQUIRED STATUTORY FINDINGS."

**{¶127}** Appellant argues here that the trial court failed to consider the proper sentencing statutes when sentencing him to maximum, consecutive sentences.

**{¶128}** Specifically, appellant contends that the trial court improperly relied on R.C. 2929.14(E)(4). He asserts that because this was a capital case, the trial court was required to sentence him pursuant to R.C. 2929.03, which sets out the guidelines for imposing sentences for capital offenses.

**{¶129}** Appellant then takes his argument one step further. Pursuant to R.C. 2929.03(D)(2)(a):

**{¶130}** "(2) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, * * * shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of

death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following:

**{¶131}** "(a) * * * to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment[.]"

**{¶132}** Appellant points out that the jury recommended a sentence of life imprisonment with parole eligibility after 30 years on each of the six aggravated murder counts. He notes that the jury chose not to recommend a life sentence without the possibility of parole. Therefore, appellant concludes, the jury must have found, after listening to the mitigation evidence, that he is capable of being rehabilitated. Appellant argues that by ordering his sentences of life imprisonment without the possibility of parole for 30 years on each of the six counts to run consecutively to each other and consecutive to his sentences on the 13 counts of arson, the trial court disregarded the jury's finding that he should be eligible for parole after 30 years and instead sentenced him to 310 years in prison. Appellant asserts that this was an abuse of the court's discretion.

**{¶133}** Our review of felony sentences is a limited, two-fold approach, as outlined by the plurality opinion in *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio4912, at ¶ 26. First, we must "examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law." Id. (O'Connor, J., plurality opinion). In examining "all applicable rules and statutes," the sentencing court must consider R.C. 2929.11 and R.C. 2929.12. Id. at ¶ 13-14 (O'Connor, J., plurality opinion). If the sentence is clearly and convincingly not contrary to law, the court's exercise of discretion "in selecting a sentence within the permissible statutory range is subject to review for any abuse of discretion." Id. at ¶ 17 (O'Connor, J., plurality opinion). Thus, we apply an abuse of discretion standard to determine whether the sentence satisfies R.C. 2929.11 and R.C. 2929.12. Id. at ¶ 17 (O'Connor, J., plurality opinion).

**{¶134}** Further, a sentencing court has "full discretion" to sentence an offender within the statutory range and is no longer required to make findings or give its reasons for imposing non-minimum, maximum, or consecutive sentences. *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, at paragraph seven of the syllabus.

**{¶135}** Appellant's sentence is not contrary to law. Despite appellant's assertion, the court considered R.C. 2929.03(D)(2). In its Judgment Entry of Sentence, the court begins its order by stating, "Upon consideration of O.R.C. 2929.03(D)(2) and all of the foregoing * * *." The court then goes on to sentence appellant to the jury's recommended sentences of life imprisonment without parole eligibility for 30 years for each of the six aggravated murder counts. Additionally, at the sentencing hearing the court noted that it was bound to honor the jury's recommended sentence. (Sen. Tr. 32). Thus, the trial court considered the appropriate statute and the jury's corresponding recommendation and entered a sentence that complied with the law.

**{¶136}** If we were to endorse appellant's argument, that would mean the trial court would be forced to order appellant's six sentences of life in prison with parole eligibility after 30 years to run concurrently. It would completely eliminate the trial court's discretion to decide whether to run sentences concurrently or consecutively. A sentencing court has full discretion to sentence an offender within the statutory range and is not required to make findings or give its reasons for imposing consecutive sentences. *Foster,* 109 Ohio St.3d at paragraph seven of the syllabus.

**{¶137}** To accept appellant's argument would also mean that the trial court could not order appellant's aggravated arson sentences to run consecutively to his aggravated murder sentences or to each other. Appellant's argument seems particularly flawed in this respect because the jury played no part in recommending a sentence for the non-capital aggravated arson offenses. Appellant's sentence on the 13 aggravated arson counts was a matter solely for the trial court.

**{¶138}** Further, the trial court did not improperly rely on R.C. 2929.14(E)(4), which the Ohio Supreme Court found unconstitutional and severed in *Foster*, 109

Ohio St.3d at paragraphs three and four of the syllabus. R.C. 2929.14(E)(4) provided certain findings that the trial court was required to make before imposing consecutive sentences on an offender. There is no indication in either the Judgment Entry of Sentence or the sentencing transcript that the court relied on this unconstitutional subsection.

**{¶139}** Finally, the trial court's ten-year sentences on each of appellant's aggravated arson convictions were within the applicable range for first-degree felonies. See R.C. 2929.14(A)(1).

**{¶140}** Thus, appellant's sentence is not contrary to law.

**{¶141}** Next, we must determine whether the trial court abused its discretion in sentencing appellant. Appellant calls our attention to several of the court's comments at sentencing that he contends demonstrate an abuse of discretion.

**{¶142}** Appellant points to the court's comments regarding his not taking the stand or making a statement (Sen. Tr. 22), calling the jury's recommendation a "break" for him (Sen. Tr. 24), making mention of Ayala's testimony regarding another fire that he was not convicted of (Sen. Tr. 24-25), and stating that it believed appellant deserved to spend the rest of his life in prison (Sen. Tr. 28).

**{¶143}** We will address each comment in turn.

**{¶144}** First, appellant takes the court's comment about him not taking the stand out of context. The court's comment came during a discussion of the statutory seriousness and recidivism factors, one of which is whether the offender has shown remorse for the offense. The court found, "the offender has shown no remorse whatsoever, even today does not make a statement." (Sen. Tr. 22).

**{¶145}** A trial court cannot use a defendant's silence at sentencing against him since the right against self-incrimination follows the defendant to sentencing. *State v. Donald*, 7th Dist. No. 08-MA-154, 2009-Ohio-4638, at ¶11. In *Donald*, the court commented at sentencing, "And the defendant, after the victim and the police officer offered overwhelming testimony against him, chose not to speak at all. So, evidently, he agreed that all that was true the way it was presented." Id. at ¶9.

**{¶146}** The court's comment in this case differs significantly from that in *Donald*. In no way did the court suggest that appellant's silence meant that appellant agreed with the testimony presented against him. Instead, the court was going through the sentencing factors it was required to take into consideration. R.C. 2929.12(D)(5) requires the sentencing court to consider whether the offender has shown any genuine remorse for the offense. One way offenders frequently express remorse is in making such a statement at the sentencing hearing. In this case the court was not holding against appellant the fact that he did not testify. Instead, it was looking at whether appellant expressed any remorse for his actions.

**{¶147}** Second, while praising the work of defense counsel in presenting mitigation evidence, the court stated, "I believe you got your break from the jury. There were sentencing options available to them that they rejected." (Sen. Tr. 24). The court then went on to talk about how the evidence likely led the jury to conclude that he did not mean to kill anyone. (Sen. Tr. 24). Thus, the court seems to give support for the jury's recommended sentence. So once again, taken in context, the court's comment does not show evidence of an abuse of discretion.

**{¶148}** Third, the court pointed out there was evidence at trial that appellant started another house fire. This reference was not improper. "Courts have consistently held that evidence of other crimes, *including crimes that never result in criminal charges being pursued*, or criminal charges that are dismissed as a result of a plea bargain, may be considered at sentencing." (Emphasis added.) *State v. Starkey*, 7th Dist. No. 06-MA-110, 2007-Ohio-6702, at ¶17.

**{¶149}** Finally, in discussing the six lives that appellant took and how a person must take responsibility for the consequences of his actions, the court commented, "it's inescapable to me, as a conclusion, that you deserve to spend the rest of your life in prison. I don't think you should ever get out." (Sen. Tr. 28). Given the facts of this case (the death of six innocent people of which four were children under the age of nine simply due to a stolen cell phone) the court's comment here was not out of line nor did it demonstrate an abuse of discretion.

{¶150} Based on the above, the trial court did not act unreasonably, arbitrarily, or unconscionably in sentencing appellant. Accordingly, appellant's fourth assignment of error is without merit.

{¶151} Appellant's fifth assignment of error states:

{¶152} "THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING APPELLEE TO AMEND THE INDICTMENT REGARDING THE CHARGES OF AGGRAVATED ARSON, PURSUANT TO OHIO CRIMINAL RULE 7(D) AT THE CLOSE OF EVIDENCE OVER OBJECTION OF APPELLANT."

{¶153} In respect to all 19 counts of arson, the original indictment read:

{¶154} "[O]n or about January 23, 2008, at Mahoning County, MICHAEL A. DAVIS did by means of fire or explosion, *knowingly create a substantial risk of physical harm* to * * *. In violation of Section 2909.02(A)(1)(B)(1)(2) of the Revised Code, a Felony of the First Degree, against the peace and dignity of the State of Ohio." (Emphasis added.)

{¶155} The statute, however, states that no person by fire or explosion shall knowingly create a substantial risk of *serious* physical harm to any person. R.C. 2909.02(A)(1). The indictment left out the word "serious."

{¶156} Neither party noticed this error. The trial court brought it to their attention. (Tr. 1644-47). The state then asked to amend the indictment to conform with the evidence. (Tr. 1648). All firefighters involved testified that the fire subjected the people involved to a substantial risk of serious physical harm. (Tr. 1418-60).

{¶157} Although the court expressed its dismay with the prosecutor's office for its poor drafting of the indictment, the court nonetheless granted the state's motion to amend the indictment and add the word "serious" to each of the arson counts over appellant's objection. (Tr. 1659-60).

{¶158} Appellant now argues that the trial court should not have allowed the state to amend the indictment. He argues that "serious" physical harm was one of the essential elements of the offense. He further points out that there is no crime

containing only the elements set out in the indictment. Appellant argues that the amendment of the indictment substantially changed the identity of the offense. He points out that "physical harm" has a different definition than "serious physical harm."

**{¶159}** Appellant next points us to this case's history. During a pretrial on July 9, 2008, the trial court instructed the state to make certain that the indictment was properly drawn and that it contained no defects. (July 9 Pretrial Tr. 3-4). At the next pretrial, the trial court asked the prosecutor if he had reviewed the indictment to ensure its accuracy. (Aug. 12 Pretrial Tr. 66-67). The prosecutor stated that the indictment had been reviewed and the state was satisfied with it. (Aug. 12 Pretrial Tr. 67).

**{¶160}** Appellant argues that appellee's failure to amend the indictment prior to trial, although being ordered by the court to review it, prohibited it from making the request to amend it at the close of its case.

**{¶161}** Appellate courts review a trial court's decision to permit the amendment of an indictment for an abuse of discretion. *State v. Beach,* 148 Ohio App.3d 181, 2002-Ohio-2759, at ¶23.

**{¶162}** Article I, Section 10 of the Ohio Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." Accordingly, the Ohio Constitution guarantees an accused that the essential facts constituting the offense will be found in the indictment. *State v. Pepka*, 125 Ohio St.3d 124, 2010-Ohio-1045, at ¶14.

**{¶163}** Crim.R. 7(D) allows the amendment of the indictment as follows:

**{¶164}** "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."

**{¶165}** If an amendment changes the penalty or degree of the charged offense, it changes the identity of the offense and is not permitted by Crim.R. 7(D). *Pepka*, at ¶15, citing *State v. Davis*, 121 Ohio St.3d 239, 2008-Ohio-4527, at ¶1. So

long as the state complies with Crim.R. 7(D), it may amend a defective indictment, even if the original indictment omits an essential element of the offense with which the defendant is charged. Id., citing *State v. O'Brien* (1987)*,* 30 Ohio St.3d 122, at 127-28.

**{¶166}** The Ohio Supreme Court addressed a similar situation in *Pepka*, 125 Ohio St.3d 124. In *Pepka*, the defendant was charged with three counts of child endangering, third-degree felonies. Each count alleged that Pepka "'did recklessly, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of a minor victim, a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, to wit: eight months of age, create a substantial risk to the health or safety of the said female minor victim, by violating a duty of care, protection, or support.'" Id. at ¶7.

**{¶167}** The indictment went on to state that this act of endangering children was a third-degree felony in violation of R.C. 2919.22(A). Id. at ¶8. A few days prior to trial, the court allowed the state to amend the indictment to add language to each count specifying that Pepka had caused "serious physical harm to the said female minor victim." Id. at ¶9. Pepka objected to this amendment. After discussing the matter with Pepka's counsel, the trial court determined that the amendment did not change the nature of the harm alleged, that Pepka had sufficient notice regarding the serious-physical-harm allegation, and that Pepka did not need additional time to prepare to defend against that allegation. The jury found Pepka guilty of all three felony counts.

**{¶168}** The court of appeals reversed Pepka's convictions finding that the original indictment was fatally defective for failing to include the serious-physical-harm element. The state appealed to the Ohio Supreme Court. The Supreme Court reversed, reasoning:

**{¶169}** "The original indictment set forth the elements of child endangering under R.C. 2919.22(A) and specified that Pepka was being charged with third-degree felonies. The only circumstance in which child endangering in violation of R.C.

2919.22(A) is a third-degree felony is when the victim suffers serious physical harm. R.C. 2919.22(E)(2)(c). Thus, the original indictment was sufficient to provide Pepka with adequate notice of both the offenses and the degree of the offenses with which he was charged." Id. at ¶21.

**{¶170}** Here too appellant had notice of the offenses and the degree of the offenses. First, the indictment specified that appellant was charged with first-degree felony aggravated arson. Second, the indictment listed the proper statutory section appellant was accused of violating, R.C. 2909.02(A)(1)(B)(1)(2). Third, it was not until the trial court brought the issue to the parties' attention, which occurred at the close of the state's case, that anyone even took notice of the omission. By this time, appellant had already defended the case of aggravated arson against him in which eight fire fighters specifically testified that they and the others were subjected to a substantial risk of serious physical harm.

**{¶171}** Additionally, the Eighth District addressed the exact issue we are faced with here, albeit with little explanation:

**{¶172}** "Defendant contends that it was reversible error for the trial judge to allow the state to amend the second count of the indictment to include the word, 'serious' preceding the words, 'physical harm to Randy Hayne.' Since the amendment did not change the name or identity of the crime charged, aggravated arson, the amendment was proper. Crim. R. 7(D). This assignment of error is not well taken." *State v. Bourjaily* (Oct. 2, 1980), 8th Dist. No. 40428.

**{¶173}** Accordingly, appellant's fifth assignment of error is without merit.

**{¶174}** Appellant's sixth assignment of error states:

**{¶175}** "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY FAILING TO GIVE PROPE[R] INSTRUCTIONS TO THE JURY REGARDING THE APPROPRIATE MENTAL STATES FOR AGGRAVATED MURDER AND AGGRAVATED ARSON AS SAID INSTRUCTIONS WERE NOT CORRECT STATEMENTS OF LAW."

{¶176} During their deliberations, the jury sent two questions to the court asking, "Is the aggravated murder charge defined by intent to kill or as a result of aggravated arson?" and "Can aggravated murder be established without intent or purpose?" (Tr. 1874). The court, after a discussion with counsel, decided to re-read the instruction on the required mental states that it had already given the jury and then give an additional instruction, to which appellant objected. (Tr. 1879). The additional instruction was:

{¶177} "The court instructs you that if you purposely kill someone by creating a substantial risk of serious physical harm to any person by fire, you have committed felony aggravated murder." (Tr. 1891).

{¶178} Appellant alleges in this assignment of error that the trial court gave improper jury instructions on the mental states for both aggravated murder and aggravated arson. Appellant contends that the jury's questions indicate that they were having a difficult time determining what mental state they had to find. He contends that the court should have simply read the jury its prior instruction as to the required mental states.

{¶179} Appellant points out that appellee had the burden to establish that appellant knowingly committed aggravated arson but also that appellant had the specific intention to kill the people in the house. He argues that the trial court's answer to the jury's questions effectively diminished the state's burden of proof. He contends that the court's answer did not adequately convey to the jury that they could not convict him of aggravated murder unless they found he had the specific intent to kill.

{¶180} If a jury requests further instruction or clarification of instructions during its deliberations, the trial court has discretion to determine its response to that request. *State v. Carter* (1995), 72 Ohio St.3d 545, 553. An appellate court will not reverse a conviction based upon the trial court's response to such a request absent a showing that the trial court abused its discretion. Id.

{¶181} "Due process requires that the state establish beyond a reasonable doubt every fact necessary to constitute the crime charged. *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368. 'Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights,' *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 97, citing *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, and subvert the presumption of innocence and the right to have a jury determine the facts of a case. *Carella v. California* (1989), 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218." *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, at ¶36.

{¶182} In order to convict appellant of aggravated murder, the jury had to find that appellant *purposely* caused the death of another while committing aggravated arson. R.C. 2903.01(B). "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶183} Courts have held that where the underlying felony in aggravated murder is aggravated arson, the intent to set the fire coupled with the knowledge that people are present inside the structure is sufficient to prove that the defendant acted purposely in causing the death of another.

{¶184} For example, in *State v. Garner* (1995), 74 Ohio St.3d 49, the defendant set three fires in an apartment building where six children were sleeping. Five of the children died in the fire. Garner's defense was that he did not intend to kill anyone as he believed the children could get out of the apartment. The Ohio Supreme Court noted that "while guilt of aggravated murder requires proof of specific intent to kill, R.C. 2903.01 contemplates that such an intent may be inferred in a felony-murder when the offense and the manner of its commission would be likely to produce death." Id. at 60. In finding sufficient evidence to support the aggravated murder convictions, the court stated: "We unhesitatingly find that the natural, reasonable and probable consequence of Garner's having set three separate fires in

an apartment occupied by six children age thirteen and under is that those children would die." Id.

**{¶185}** And in *State v. Thompson* (1977), 55 Ohio App.2d 17, where several men set fire to a restaurant, the Fifth District concluded:

**{¶186}** "While the act of burning the structure alone may not be sufficient to infer intent, when combined with the appellants' knowledge that others were actually exposed to the great danger they created, the element could be presumed from the natural and probable consequences of their acts. Their deliberate actions went beyond mere recklessness. The requirements of the statute have been fulfilled for these appellants, Thompson and Tilton, by their course of conduct, intended the consequences of their action." Id. at 23.

**{¶187}** In *Grant*, from which the trial court took its instruction, the Ohio Supreme Court considered whether R.C. 2903.01(B) was unconstitutionally vague as applied to the defendant in that case. Finding no vagueness with the statute, the Court explained:

**{¶188}** "R.C. 2903.01(B) is neither vague on its face nor as it applies to the appellant. It provides: 'No person shall purposely cause the death of another while committing or attempting to commit * * * aggravated arson or arson * * *.' Burning down an occupied home, known to contain children, in order to kill the children is clearly encompassed within both R.C. 2909.02, the aggravated arson statute, and R.C. 2903.01(B). If you purposely kill someone by 'creat[ing] a substantial risk of serious physical harm to any person' by fire, you have committed felony murder. The statute could not be clearer." *Grant*, 67 Ohio St.3d at 474.

**{¶189}** The facts of *Grant* are distinguishable from this case, however, because in that case the prosecution's theory of the case was that Grant set a fire in her children's bedroom in order to kill them and collect their life insurance proceeds. Thus, Grant had a specific intent to kill and used arson as the means to do so. But in this case, there was no evidence that appellant set out with the agenda to kill

anyone. Instead, this case is much more similar to *Garner*, supra, and *Thompson*, supra, where the defendants set out to start fires and people died as a result.

**{¶190}** That being said, the trial court's instruction to the jury was not an abuse of discretion.

**{¶191}** Firstly, we must consider the court's instruction to the jury as a whole and not view one part in isolation. *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 231. Before giving the contested instruction, the trial court instructed the jury:

**{¶192}** "Before you can find the defendant guilty of aggravated murder, you must find beyond a reasonable doubt that * * * this defendant purposely caused the death of another while the defendant was committing or attempting to commit, or fleeing immediately after committing or attempting to commit, the offense of aggravated arson.

**{¶193}** "Aggravated arson has already been defined for you, so aggravated murder is purposely causing the death of another as a result of that aggravated arson.

**{¶194}** "The state must prove that the defendant acted purposely in causing the death of another, so purpose is an essential element of each of the offenses of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result.

**{¶195}** "So it must be established in this case that at the time in question there was present in the mind of the defendant the specific intention to cause the death of another by committing the crime of aggravated arson.

**{¶196}** "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally, not accidentally. So purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he tells it to someone else, tells someone else what he did or why he did it, or indicates what he did or why he did it by his conduct. So the purpose with which a person does an act

is determined by the manner in which it is done, the means used by him, and all other facts and circumstances in evidence.

**{¶197}** "* * *

**{¶198}** "Ladies and gentlemen, aggravated arson is defined as by means of fire or explosion, knowingly creating a substantial risk of serious physical harm to any other person." (Tr. 1888-91).

**{¶199}** The court then gave the one sentence instruction that appellant now takes issue with.

**{¶200}** When reading the instruction as a whole, as we are required to do, the court made clear to the jury that they had to find that appellant acted with purpose in committing aggravated murder. It told the jury that appellant had to act with "a conscious objective," had to act "intentionally" and "not accidentally," and had to have the "specific intention to cause the death of another."

**{¶201}** Secondly, the contested instruction is a correct statement of the law. If appellant *purposely* killed someone by means of arson, then he is guilty of aggravated murder. The court satisfactorily instructed the jury as to purpose. And the court made clear, in response to the jury's questions, that aggravated murder cannot be established without intent or purpose.

**{¶202}** Hence, the trial court did not abuse its discretion in instructing the jury. Accordingly, appellant's sixth assignment of error is without merit.

**{¶203}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Vukovich, .J., concurs.

Waite, P.J., concurs.