**[Cite as *State v. Hall*, 2025-Ohio-5020.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                   Court of Appeals No.  L-24-1229

    Appellee                                              Trial Court No.  CR0202302317

v.

Devon R. Hall                                              **DECISION AND JUDGMENT**

    Appellant                                            Decided: November 4, 2025

* * * * *

Julia Bates, Lucas County Prosecuting Attorney, and
Evy Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel Kendall, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Devon R. Hall, appeals from a judgment of conviction and

sentence entered by the Lucas County Court of Common Pleas. For the reasons that

follow, the trial court's judgments are affirmed.

## Statement of the Case

{¶ 2} On August 24, 2023, Hall was indicted on a charge of aggravated murder in violation of R.C. 2903.01(B) and (G) (Count 1); a charge of murder in violation of R.C. 2903.02(A) and R.C. 2929.02 (Count 2); and a charge of murder in violation of R.C. 2903.02(B) and R.C. 2929.02 (Count 3). All three of these charges were unclassified felonies. Hall was also indicted on a charge of aggravated arson in violation of R.C. 2909.02(A)(1), (B)(1), and (B)(2), a felony of the first degree (Count 4); and a charge of aggravated arson in violation of R.C. 2909.02(A)(2), (B)(1), and (B)(3), a felony of the second degree (Count 5).

{¶ 3} The matter went to trial, and a jury found Hall guilty on all counts. At sentencing, the trial court found that the three murder convictions merged as allied offenses of similar import, and the prosecution elected to sentence on the conviction for aggravated murder. The trial court rejected defense counsel's argument that the aggravated arson convictions should also merge with the conviction for aggravated murder.

{¶ 4} The trial court sentenced Hall to a term of life in prison without the possibility of parole for the aggravated murder (Count 1); a minimum term of 11 years to a maximum term of 16.5 years in prison for the first count of aggravated arson (Count 4); and a minimum term of eight years to a maximum term of 12 years in prison for the second count of aggravated arson (Count 5). Hall timely filed an appeal.

2.

## Statement of the Facts

### The Fire

{¶ 5} On August 10, 2023, a crew of firefighters responded to a report of an active fire at 1105 Klondike. A drone-recorded video of the scene shows that multiple firemen approached an area of thick smoke coming from the rear of a single-family home, while several firefighters climbed ladders to get onto the home's pitched roof. Using a chainsaw and other tools, the firefighters cut a hole in the roof. The purpose of the hole was to allow smoke to escape and to improve visibility inside the structure.

### The Investigation

{¶ 6} Toledo Police Officer Scott Bruhn responded to the scene with his body camera activated. He saw smoke coming from the house, indicating to him that the fire was still active. Bruhn tried the door handle, but found the door was locked. He kicked the door in but did not enter because heavy smoke limited his visibility to about a foot inside the house.

{¶ 7} As Bruhn went around the side of the house trying to hear if anyone might be inside, he encountered a lawncare worker on the property. The lawncare worker reported having just chased a man who had taken a gas can from the worker's truck and then thrown it onto the fire. Bruhn searched the area but did not find anyone who matched the lawncare worker's description of the man.

{¶ 8} While still at the scene, Bruhn learned that firefighters had discovered a body inside the house.

3.

{¶ 9} Detective Justin Hawkins arrived at the property to conduct a homicide investigation. Hawkins canvassed the area looking for witnesses and video recordings. He spoke with the owner of 1105 Klondike, Alonzo Wright, who, along with his daughter, operated the residence as a group home for people with mental or cognitive challenges.

{¶ 10} On the date of the fire, the home had two residents. One of those residents was C.P., who Detective Hawkins learned had been in front of the house in the minutes before the fire started. According to Hawkins, C.P. was unable to provide much information due to his mental condition. Wright, on the other hand, provided recordings from several surveillance cameras that were mounted along the front of his own residence, which was located across the street at 1068 Klondike. Hawkins also collected surveillance recordings from a nearby factory whose property ran along the back of 1105 Klondike.

{¶ 11} A surveillance video compilation that was created by Hawkins from the collected videos depicts C.P. sitting in a chair in front of 1105 Klondike, with a bald black man standing near him. The bald man is wearing a gray shirt, dark colored shorts, and white sneakers with a dark insignia consistent with a Nike swoosh. The bald man can be seen going into the house and then emerging with a bowl in his hand, which he takes over to a lawncare truck that is parked on the street nearby. He appears to fill the bowl with gasoline from a gas can located in the truck bed and then takes the bowl to the rear of 1105 Klondike. Soon after, he returns to the front of the house. Next, C.P. can be seen

4.

walking into the residence through the front door, and the bald man is seen running back to the lawncare truck, this time with a jug in his hand. The bald man appears to fill the jug with gas before returning to the back of the house a second time. A separate surveillance video shows him as he appears to pour gasoline into the back window of the home. He then returns to the lawncare truck a third and final time. The lawncare worker to whom the truck belongs is now standing at the back of the truck. Ignoring the worker, the bald man grabs the gas can out of the truck and returns with it to the back of 1105 Klondike. Seconds later, a large amount of smoke and flames is seen coming from the rear of the house. Recordings from the nearby factory depict the same bald individual running through the factory property toward nearby railroad tracks.

**The Fire Scene Investigation**

{¶ 12} When fire investigator Kathryn Bown arrived, she could see flames at the back corner of the house and coming out of a small window on the left-hand side of the house. She testified that as she approached the residence, she could smell a strong odor of gasoline, which grew stronger as she neared the home's left rear corner. On the ground at the back of the house, she discovered a gas nozzle. Brown explained to the jury that gasoline is commonly used as an accelerant in fires.

{¶ 13} Brown did not immediately conclude that the fire's origin was arson, because she recognized there could be other sources of the gasoline odor. However, she found nothing to suggest any other explanation. Instead, she discovered an irregularly-shaped burn pattern in the grass that was indicative of the presence of an accelerant. The

5.

burn pattern was near a window and smelled strongly of gasoline. The surveillance recordings and the burn pattern supported her opinion that gasoline was used in or near the windows.

{¶ 14} Brown said that the body of the victim, R.S., was discovered lying face down on the floor of the victim's bedroom, a few feet from the back door.

{¶ 15} Brown collected the gas nozzle from the scene. She also collected blinds from the window, because they smelled strongly of gasoline, and a pint-size can full of fire debris. The blinds and fire debris tested positive for gasoline.

{¶ 16} Brown opined that the origin of the fire was in the bedroom at the rear of the house. Based on the testing of the items she collected at the scene, testing on a pair of shoes that was subsequently collected from Hall, the surveillance recordings, and the location of the fire's origin, Brown opined that the fire was intentionally set.

**Hall's Arrest**

{¶ 17} Hall was arrested on August 16, 2023, six days after the fire. When he was arrested, he was wearing jeans over a dark gray-blue pair of shorts that were like the shorts worn by the suspect in the surveillance recordings. Hall also had a bag with a pair of white Nike shoes inside. The shorts had some blood stains on them, one of which contained DNA consistent with the victim's DNA. Hall's shoes tested positive for gasoline.

{¶ 18} Hall exhibited several injuries when he was arrested. He had a wound above his right eyebrow that had scabbed over, and his left ring finger was injured

6.

beginning in the cuticle area and extending into the flesh of the finger. He also had an injury on the anterior side of his left forearm.

## Forensic Analysis of Evidence

{¶ 19} Mollie Jordan, an analyst with the state fire marshal's forensic lab, testified that gasoline was detected on the gas nozzle, debris from the fire, melted mini blinds, swabs from the hands and torso of the victim, and the Nike shoes. She checked the nozzle for latent fingerprints but none were detected. She also swabbed the nozzle for DNA, but there was insufficient DNA to make a comparison.

{¶ 20} DNA testing of a stain on Hall's shorts showed a mixture of two contributors -- one was consistent with Hall and the other was consistent with the victim, R.S. The frequency of the occurrence of a profile consistent with Hall's was rarer than one in one trillion unrelated individuals, and the estimated frequency of the DNA profile not attributed to Hall was rarer than one in one trillion unrelated individuals. The lawncare worker, E.S., and his son were each excluded as a source contributing to the mixture of DNA.

## Autopsy

{¶ 21} Lucas County Coroner Thomas Blomquist testified that R.S.'s body was unclothed when he received it. The body was charred, except for the left armpit and right thigh, breast, and cheek. Soot was detected in the throat, but it did not go beyond the vocal cords. Blomquist explained that the high heat from a fire will often cause a spasm

of the vocal cords, which closes off the person's airway, preventing any further inhalation of smoke.

{¶ 22} Blomquist also said that the body exhibited blunt force injuries to the left temple and masseter muscles on both sides of the face. The area above the right eye was contused, and there was a contusion on the top and back of the scalp, as well as over the left shoulder blade and mid back. Hemorrhaging in the masseter muscles was acute or very fresh, having occurred within minutes to hours of death. The victim had missing teeth on both sides that appeared to have been fractured acutely or close in time before the victim's death, based upon fresh blood clots where the roots were exposed. Blomquist testified that a fall or accidental striking would usually result in injury to one location, but the victim had blunt force injuries on multiple sides. He testified that injuring teeth on both sides of the face would be "incredibly hard" to do by accident. He stated that in his experience, such injuries are typically seen after someone has been in an altercation or a fight.

{¶ 23} Toxicology testing revealed that R.S. was intoxicated with cocaine at the time of her death, and that there was a low level of carbon monoxide in her body. The presence of soot in her throat indicated that she was alive at the time she was burned by the fire.

{¶ 24} Blomquist opined that R.S.'s cause of death was thermal burn injuries, with smoke inhalation and significant blunt force injuries on both sides of the head contributing to her death. He said that the manner of death was homicide.

8.

**Discussion of Search Warrant at Trial**

{¶ 25} During the course of Hall's trial, Hall's counsel handed Detective Hawkins a search warrant marked as Defendant's Exhibit A and began to cross-examine him about whether he had a search warrant to have Hall's shorts tested and to get Hall's buccal swab. Hawkins testified that he had a search warrant to get the buccal swab and he agreed that the same search warrant attached an inventory that was used to have the shorts obtained from Hall. The prosecution objected and the trial court sustained the objection, saying, "That exhibit will be stricken from the record."

{¶ 26} The index to the trial transcript lists the search warrant as Exhibit A. However, Hall himself concedes that neither the search warrant nor the affidavit in support of the search warrant is in evidence. In fact, neither of those documents appear anywhere in the record on appeal.

**Assignments of Error**

{¶ 27} On appeal, Hall asserts the following assignment of error:

I.    Appellant received ineffective assistance of counsel due to the failure of defense counsel to file a Motion to Suppress the Search Warrant which was used here to authorize DNA testing on some of appellant's clothing.

II.   Appellant's convictions were based in [sic] insufficient evidence.

III.  Appellant's convictions were not supported by the manifest weight of the evidence.

9.

IV.      The trial court abused its discretion by refusing to merge all of the offenses herein as allied offenses of similar import, when the harm from all of them was arguably the death of the victim.

## Law and Analysis

### First Assignment of Error

{¶ 28} Hall argues in his first assignment of error that his trial counsel was ineffective in failing to file a motion to suppress evidence obtained pursuant to the search warrant that was used to authorize DNA testing on some of Hall's clothing.

{¶ 29} To establish ineffective assistance of counsel, Hall must show "'(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.'" *State v. Warren*, 2024-Ohio-1072, ¶ 38 (6th Dist.), quoting *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). "Because 'effective assistance' may involve different approaches or strategies, our scrutiny of trial counsel's performance 'must be highly deferential' with a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Whitman*, 2021-Ohio-4510, ¶ 51 (6th Dist.), quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989). "A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner." *Warren* at ¶ 38,

10.

quoting *State v. McDonald*, 2015-Ohio-1869, ¶ 18 (6th Dist.), citing *State v. Hamblin*, 37 Ohio St.3d 153, 155-156 (1988).

{¶ 30} "The 'failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel.'" *State v. Spaulding*, 2016-Ohio-8126, ¶ 94, quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "Instead, the ordinary two-part *Strickland* analysis for ineffective-assistance claims applies." *Id.* The defendant "must both 'prove that there was a basis to suppress the evidence in question,' *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65, and demonstrate a reasonable probability that had the evidence been suppressed, 'the result of the proceeding would have been different,' *Strickland* at 694." *Id.*

{¶ 31} "[I]t may be difficult for a defendant to establish in hindsight that a suppression motion would have been granted on the basis of evidence contained in a trial transcript." *State v. Taylor*, 2008-Ohio-482, ¶ 14 (4th Dist.). "'[T]he record developed at trial is generally inadequate to determine the validity of [a] suppression motion' because the issues at trial are different than the issues at a suppression hearing." *State v. Oliver*, 2018-Ohio-3667, ¶ 38 (8th Dist.), quoting *State v. Culbertson*, 2000 WL 1701230, *4 (5th Dist. Nov. 13, 2000). "'"Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met [the appellant's] burden of proving that [the appellant's] attorney violated an essential duty by failing to file the motion."'" *State v. Neyland*, 2014-Ohio-1914, ¶ 126, quoting *State v. Drummond*, 2006-Ohio-5084, ¶ 208, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95 (8th Dist.1980).

11.

Additionally, "'[w]here the record is not clear or lacks sufficient evidence to determine whether a suppression motion would have been successful, a claim for ineffective assistance of counsel cannot be established.'" *State v. Barfield*, 2015-Ohio-891, ¶ 16 (4th Dist.), quoting *State v. Parkinson*, 1996 WL 363435, *3 (5th Dist. May 20, 1996).

{¶ 32} As indicated above, neither the search warrant nor the affidavit in support of the search warrant is in the record. Hall argues on appeal only that "the evidence *apparently available* to support a search warrant consisted basically of a very grainy series of photographs of someone in dark short[s], dark t-shirt, and white shoes," and, as such, the evidence was "insufficient to support a search warrant." (Emphasis added.)

{¶ 33} We find that Hall has failed in his burden to show that trial counsel was deficient for not filing a motion to suppress, first because the trial transcript lacks sufficient evidence to determine whether a suppression motion would have been successful, but also because the record makes clear that Hall's shorts and shoes were seized during a search incident to arrest.[1]

{¶ 34} "'A search incident to arrest permits an officer to conduct a full search of the arrestee's person, and that search is not limited to the discovery of weapons, but may include evidence of a crime as well.'" (internal citations and quotations omitted) *State v. Dotson*, 2016-Ohio-8065, ¶ 17 (6th Dist.), quoting *State v. Pinkelton*, 2008-Ohio-980, ¶ 24 (6th Dist.). "Once a defendant is lawfully in custody, his clothing may lawfully be

---

[1] Hall does not make, nor has he ever made, a claim that his arrest in this case was invalid.

12.

searched and seized without a warrant," *Pinkelton* at ¶ 29, citing *United States v. Edwards*, 415 U.S. 800 (1974), "and later subjected to laboratory analysis." *State v. Alltop*, 2014-Ohio-1695, ¶ 29 (12th Dist.), quoting *Edwards* at 804.

{¶ 35} To the extent that Hall claims his trial counsel was ineffective in failing to file a motion to suppress evidence of Hall's buccal swab, we note that Hall's buccal swab was likewise taken pursuant to his arrest, as authorized under R.C. 2901.07(B)(1)(a). *See* R.C. 2901.07(B)(1)(a) (a person who is…arrested for a felony offense shall submit to a DNA specimen collection procedure…during the intake process at the jail).

{¶ 36} Not only does the trial transcript lack sufficient evidence to determine whether a suppression motion would have been successful in this case, but, perhaps more importantly, trial counsel had no obligation to file a motion to suppress evidence obtained pursuant to a search warrant where that evidence would have been admissible even without a search warrant.  As such, Hall has failed to meet his burden of demonstrating either prong of his claim for ineffective assistance of counsel. Hall's first assignment of error is found not well-taken.

**Second Assignment of Error**

{¶ 37} Hall argues in his second assignment of error that his convictions were based on insufficient evidence. "Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law." *Toledo v. Manning*, 2019-Ohio-3405, ¶ 13 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The test for sufficiency is one of

13.

adequacy, or 'whether the evidence, if believed, can sustain the verdict as a matter of law.'" *State v. Kimble,* 2025-Ohio-310, ¶39 (6th Dist.), quoting *Manning* at ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132. "Indeed, in making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses." *Kimble* at ¶ 39, citing *State v. Walker*, 55 Ohio St.2d 208, 212 (1978).

{¶ 38} Hall was convicted of aggravated murder, which requires proof that he (1) purposely caused the death of another (2) while committing or attempting to commit (3) aggravated arson. *See* R.C. 2903.01(B) and (G). Aggravated arson includes the elements that a person (1) by means of fire (2) knowingly (3) created a substantial risk of serious physical harm to any person other than the offender. *See* R.C. 2909.02(A)(1). Aggravated arson is also satisfied by proof that a person (1) by means of fire (2) knowingly (3) caused physical harm to any occupied structure. *See* R.C. 2909.02(A)(2).

## A. Identity

{¶ 39} Hall specifically argues that evidence of his identity was insufficient to sustain the verdicts.

{¶ 40} Here, the State provided surveillance recordings of an individual making three trips to get gasoline from the lawncare worker's truck, with the individual appearing (at least at one point) to pour gasoline directly into a window of the house at 1105 Klondike. The individual was wearing shorts that matched those Hall was wearing at the time of his arrest. The shorts that Hall was wearing at the time of his arrest were stained with a substance that was presumptively positive for blood and contained a mixture of

14.

DNA consistent with Hall and the victim. In addition, the surveillance videos depicted the individual's white shoes with a black insignia, consistent with shoes Hall had with him at the time of his arrest. The shoes that Hall had with him at the time of his arrest tested positive for gasoline, as did the victim's body, and as did the debris from inside 1105 Klondike. Finally, six days after the fire, Hall still bore cuts and wounds to his arm, face, and hand that allowed a reasonable inference that he was involved in a confrontation with the victim before the fire.

{¶ 41} While such evidence is circumstantial, identity can be proved by circumstantial evidence, "just like every other element the state must prove." *State v. Nobles*, 2011-Ohio-5041, ¶ 19 (6th Dist.), quoting *State v. Allah*. 2009-Ohio-3887, ¶ 16 (8th Dist.). Circumstantial evidence is "as probative as direct evidence," and circumstantial evidence alone is sufficient to sustain a conviction. *State v. Walker*, 2020-Ohio-839, ¶ 52 (6th Dist.). In fact, "circumstantial evidence is often the norm." *Id.* at ¶ 57.

{¶ 42} Hall argues that the State offered "no evidence that he knew the victim, or frequented the house where she lived, doing odd jobs, or anything that might produce blood stains on his clothing." But such evidence was not required to support the elements of the offenses charged. In fact, the absence of such evidence heightens the value of the circumstantial evidence that linked Hall to the crime scene. If Hall did not know the victim or visit her home doing odd jobs or have some other reason to be in her home, there is no reasonable explanation for his being at the residence, or for the existence of

15.

the victim's DNA on Hall's clothing, other than in connection with the commission of the offenses charged.

## B. Purpose

{¶ 43} Hall also complains that there was no evidence that he "knowingly" murdered the victim. Aggravated murder requires proof of "purposely" causing the death of another by "knowingly" committing an act of arson. The prosecution provided sufficient evidence to permit a reasonable inference that Hall had the requisite mens rea for aggravated murder.

{¶ 44} "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). And a person acts knowingly, "regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will be of a certain nature." R.C. 2901.22(B).

{¶ 45} "Courts have held that where the underlying felony in aggravated murder is aggravated arson, the intent to set the fire coupled with the knowledge that people are present inside the structure is sufficient to prove that the defendant acted purposely in causing the death of another." *State v. Davis*, 2011-Ohio-292, ¶ 183-186 (7th Dist.), citing *State v. Garner*, 74 Ohio St.3d 49 (1995); *State v. Thompson*, 55 Ohio App.2d 17 (5th Dist. 1977).

{¶ 46} Here, the coroner clearly testified that the victim sustained numerous injuries before her death in the fire. He opined that the blunt force trauma to different sides of her body was unlikely to occur accidentally and that the bilateral shearing off of

16.

her teeth was indicative of a non-accidental injury. Moreover, the victim herself had gasoline on her body, allowing the jury to infer that Hall poured the accelerant on her.

{¶ 47} Surveillance recordings depicted Hall making three trips to the gas can on the lawncare worker's truck, and on the last trip taking the can itself. An additional surveillance recording showed him apparently pouring gasoline into the house, specifically in the area of the victim's bedroom. The jury could reasonably infer that Hall attacked the victim, poured the accelerant on her body, and then set fire to the house where she lived.

{¶ 48} Evidence of Hall's knowledge of R.S.'s presence in the home together with evidence that he intentionally set fire to the home was sufficient to support a finding that Hall "knowingly" committed an act of arson and "purposely" caused the death of the victim. Accordingly, Hall's second assignment of error is found not well-taken.

**Third Assignment of Error**

{¶ 49} Hall argues in his third assignment of error that even if the evidence was sufficient to sustain his convictions, the convictions were not supported by the manifest weight of the evidence. In determining whether Hall's conviction is against the manifest weight of the evidence, we must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *Thompkins* 78 Ohio St.3d, at 387.

17.

"We do not view the evidence in a light most favorable to the State; rather, we 'sit as a "thirteenth juror" and scrutinize "the factfinder's resolution of the conflicting testimony."'" *State v. Jackson,* 2024-Ohio-2419, ¶ 67 (6th Dist.), quoting *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.).

{¶ 50} Hall's arguments are essentially that: (1) the videos and screen shots of the suspect were insufficient to identify him as the perpetrator of the offenses; (2) the actions caught on video merely showed someone moving back and forth in the vicinity of a residence which burned a short time later; (3) there was no evidence of him assaulting the victim or even knowing her; (4) the victim's DNA was present in only one of six stains on Hall's shorts, and there was no explanation of how or when the blood got there; (5) there was no evidence presented as to how the injuries on his body occurred; (6) there was no evidence presented as to how the blood stains related to the fire; and (7) there was no evidence as to his intent to purposefully or knowingly murder the victim.

{¶ 51} As previously discussed, there was substantial evidence that Hall was the perpetrator of the crimes. In addition to the recordings and photographs, the items he wore and had in his possession upon arrest contained the victim's DNA as well as the same accelerant detected at the scene and on the victim. The coroner unambiguously testified that the victim sustained severe injuries before the fire. The absence of any reasonable alternative explanation for the victim's blood on Hall's clothing further incriminates him. The surveillance videos allowed the jury to conclude that Hall made the

18.

three trips to the gas can in the back of the lawncare truck in order to set the fire, either to further or to conceal the assault on R.S. Finally, the evidence revealed that six days after the fire, Hall himself still had wounds to his face, hand, and forearm. The jury could certainly infer that Hall's own wounds could be the source of some of the bloodstains on his clothing, so that the presence of the victim's DNA in only one of those stains would not undermine the case against him.

{¶ 52} The evidence in this case does not support the conclusion that the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Hall's third assignment of error is found not well-taken.

**Fourth Assignment of Error**

{¶ 53} Hall argues in his fourth assignment of error that the trial court abused its discretion by refusing to merge all of the offenses as allied offenses of similar import, where "the harm from all of them was the death of the victim," and where the incident "was actually one continuous bad act."

{¶ 54} "'R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibit multiple punishments for the same offense.'" *State v. Turvey*, 2023-Ohio-2248, ¶ 107 (6th Dist.), quoting *State v. Rogers*, 2022-Ohio-4126, ¶ 16 (6th Dist.). R.C. 2941.25 provides:

19.

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 55} The test for determining whether allied offenses should be merged involves three questions: "'"(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?"'" *State v. Bailey*, 2022-Ohio-4407, ¶ 10, quoting *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31. "If the answer to any of these questions is 'yes,' the defendant may be convicted and sentenced for multiple offenses." *State v. Frierson*, 2024-Ohio-5521, ¶ 21 (6th Dist.), citing *Ruff* at ¶ 25, 31. The Ohio Supreme Court has emphasized that a merger analysis must focus on the defendant's conduct, rather than simply compare the elements of the various offenses. *Ruff* at ¶ 26, 30.

{¶ 56} "The defendant bears the burden of establishing that R.C. 2941.25 prohibits multiple punishments." *State v. Kretzer,* 2024-Ohio-2494, ¶ 14 (6th Dist.), citing *State v. Smith*, 2023-Ohio-866, ¶ 10 (6th Dist.), citing *State v. Washington,* 2013-Ohio-4982, ¶ 18. "Although determining whether R.C. 2941.25 has been properly applied is a legal

20.

question, it necessarily turns on an analysis of the facts, which can lead to exceedingly fine distinctions." *Bailey* at ¶ 11.

{¶ 57} Here, Hall was convicted of aggravated murder for knowingly causing the death of another during the commission of arson. He was also convicted of two counts of arson, with one count involving substantial risk of serious physical harm to an individual inside the structure and the other involving physical harm to the structure itself. At sentencing, defense counsel argued that the arson convictions should merge into the aggravated murder convictions "because they are essentially an element of the offense of aggravated murder." But under *Ruff*, a predicate offense does not always merge with an aggravated murder conviction at sentencing. *See State v. McKnight*, 2022-Ohio-591, ¶ 1, 44 (10th Dist.) (aggravated burglary that served as a predicate offense for felony murder did not merge with murder count at sentencing).

## A. Separate Animus

{¶ 58} The Tenth District Court of Appeal, in *State v. Albert*, 2015-Ohio-249, ¶ 28 (10th Dist.), concluded that an aggravated arson conviction did not merge into a felony murder conviction, because in that case, the intent to kill the victim was separate from the intent to cause him serious harm by means of fire. Specifically, the court concluded that Albert's act of pouring gasoline on a victim and setting him alight was an act "far in excess of what is required to commit an aggravated arson and, given the circumstances, indicate[d] that [Albert] participated in an act with a separate animus to kill [the victim]," so that the offenses did not merge. *Albert* at ¶ 28.

21.

{¶ 59} The Tenth District reasoned that the ultimate issue was whether "excessive force was used to commit the underlying offense, which would indicate that the intent to kill was separate [from] the intent to commit the underlying offense." *Id.* at ¶ 27, citing *State v. Metcalf*, 2012-Ohio-6045, ¶ 15-16 (2d Dist.); *State v. Miller*, 2014-Ohio-3907, ¶ 47-48 (8th Dist.); *State v. Whipple*, 2012-Ohio-2938, ¶ 42.

{¶ 60} The evidence in the current case allowed the inference that before the victim's death, Hall assaulted R.S., inflicting blunt force trauma so violent that it sheared off several of her teeth, after which he poured gasoline on her body and on her house, and then set the house on fire. Hall's act of first pouring gasoline on R.S. and then setting her house on fire was an act far exceeding that which was required to commit aggravated arson and, as in *Albert,* indicated that he committed an act with a separate animus to kill. As the offenses of aggravated murder and aggravated arson involved separate animuses, the trial court did not err in refusing to merge them. *See Ruff* at ¶ 31.

## B. Dissimilar Import

{¶ 61} Even if the offenses of aggravated murder and aggravated arson did not involve separate animuses, they were clearly dissimilar in import. In *Ruff*, the Ohio Supreme Court explained that offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

22.

## I. Separate Victims

{¶ 62} In this case, *Ruff* permits a finding that the acts were of dissimilar import, first, because multiple individuals were endangered in the fire. *See id.*; and *State v. Johnson*, 2019-Ohio-3270, ¶ 11-13 (8th Dist.), citing *State v. Piscura*, 2013-Ohio-1793 (8th Dist) (holding that three counts of attempted murder for each of three people who escaped a fire-bombed house did not merge).

{¶ 63} Just before the fire started, Hall was seen standing outside the front of the residence at 1105 Klondike, very near C.P., who was at the same location but sitting in a chair. C.P. remained sitting in the chair while Hall made his first trip to retrieve gasoline from the truck. But then C.P. stood up and entered the front door of the residence. Hall made two additional trips from the house to the lawncare truck (and back) before the house erupted into flames.

{¶ 64} C.P., at first outside the house and later inside the house, was himself exposed to a "substantial risk of serious physical harm" from the fire. *See* R.C. 2909.02(A)(1). The risk to C.P. was a risk separate and distinct from the risk to R.S., and so, on this basis alone, the aggravated arson charge did not merge with the aggravated murder conviction.

{¶ 65} Moreover, there were firefighters who responded to the call for an active fire at 1105 Klondike, several of whom climbed onto the roof with a chainsaw and other tools in order to saw holes in the roof. In setting the fire, Hall created a substantial risk of harm, not just to R.S. and C.P., but also to the firefighters whose duty it was to respond

23.

and to put out the fire in the house. *See State v. Keough*, 2009-Ohio-6260, ¶ 20 (6th Dist.) (aggravated arson conviction was supported by the substantial risk of harm to firefighters who responded to the scene); *see also* R.C. 2909.01(A) and (B) (to "create a substantial risk of serious physical harm to any person" includes the creation of a substantial risk of serious physical harm to firefighters.)

{¶ 66} As there were multiple separate victims connected with the aggravated arson conviction involving substantial risk of serious physical harm, and only one victim of the aggravated murder, there is no question that the aggravated arson conviction did not merge with the aggravated murder in this case.

## II. Dissimilar Harm

{¶ 67} Finally, *Ruff* held that offenses are not allied offenses of similar import when "they are not alike in their significance and their resulting harm." *Id.* at ¶ 21. The aggravated arson convictions in this case involve two distinct harms – one, a substantial risk of serious physical harm to people, under R.C. 2909.02(A)(1), and the other, damage to the structure of the house, under R.C. 2909.02(A)(2). As these offenses are clearly not alike in significance and harm, they do not merge under *Ruff*.

{¶ 68} For the foregoing reasons, we find that Hall has failed to satisfy his burden of showing that the offenses of arson should merge into the offense of aggravated murder. His separate offenses supported separate convictions and sentences, and the trial court properly declined to merge the aggravated arson convictions with each other or

24.

with the aggravated murder conviction. Hall's fourth assignment of error is found not well-taken.

## Conclusion

{¶ 69} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Christine E. Mayle, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.